All right, good morning. Welcome to the United States Court of Appeals for the Fourth Circuit. We have two cases on for argument this morning. First up, 25-1728, C.L.G. v. South Carolina Department of Social Services. Mr. Is it Butcher or Butcher? I'm sorry. Butcher, like the meat cutter you're on? Yes, sir. Okay, well, you're up. Good morning, or I'm sorry. May it please the court? My name is Robert Butcher. I have the honor of representing C.L.G. and C.N.G. These are two minor children whose foster parents were gracious enough to provide foster care services in the state of South Carolina. And this case is about the affirmative placement decision that D.S.S. knowingly made that Cary Register was the D.S.S. employee. And it created a foreseeable risk to two identifiable children. When this case was referred to me, I immediately thought this state created danger. You know, we certainly know that the Doe case, or Doe-X-Rayle-Johnson v. D.S.S., which was issued by this court in 2010, protects children in the custody of the state of South Carolina. That is the differentiation. So it is definitely not on all fours. But what we believe that does is it provides the framework for protecting children and not endangering children from a legal aspect. We know that there are professional social work standards where you don't place sexually aggressive children with younger and more vulnerable children. But the court said, hey, this is not good. And we also have plenty of criminal statutes and that type of stuff. So bottom line was, did Cary Register know at the time that placing a child with a propensity to sexually act out on children, not just they might, but a documented history that she knew about. Judge Archer, can I ask you a question about Ms. Register and exactly what you alleged in the complaint? Yes, Your Honor. I don't, I mean, maybe I missed it, but it seemed like the complaint doesn't really directly allege that it was Ms. Register who was responsible for omitting the information that you think should have been provided to the foster parents. Is that the allegation? I mean, even the complaint doesn't seem to say that, though. It said that, and the complaint wasn't very certain at the time. What's the answer, yes or no? Yes. The complaint does not say that, but we've learned through the process of discovery that Ms. Register actually had her hands in the placement decision and that she made the placement decision. So, what South Carolina has done in certain regions is they have a placement hub where they basically call up on the phone and get a foster placement from, you know, four or five, or actually probably less, employees of DSS. But here, Register was, you know, called and said, I have a kid that needs placement and didn't bother to say, oh yeah, by the way, this child likes to have sex with other children and you have two young boys, or actually three young children in the home. Okay. So, you made reference to the Doe case, and I think we all are familiar with that case, but how would that case have put Ms. Register on notice that she had an obligation to inform the foster parents of the negative tendencies of these children? What Doe stands for is what you just said, that these social workers have an affirmative obligation with respect to children in their custody. But these children who were allegedly harmed by the child who was placed in their home, they were not in the custody of the Department of Social Services. How does Doe put Ms. Register on notice of her obligations? Yes, Your Honor. So, and I apologize. So, so what we're looking, so what we are arguing is that under the state-created danger theory, you know, that bottom line that there was an affirmative act and a known risk, and... So, so you agree it's not, she wasn't put on notice by Doe, so you think she's put on notice by the broader state-created danger doctrine? I think that's where the court should ultimately end up. Because you sort of began by saying Doe itself is just, is not really the case we've got. It's got some broad principles that apply, but it's not the case. We really need to look at the state-created danger doctrine to put the defendant on notice here. Yes. And, you know, Judge Dias, you know, he framed the holding of Doe, but it also, from a broader standpoint for the case workers, it basically says don't endanger other children with your placement decisions. You know? Okay, but Mr. Butcher? Yes, Your Honor. Mr. Butcher, how do you meet the clearly established problem? Where is the clearly established principle that the state's duty extends beyond the child in the state's custody to foster children who are in a house or home that receives the placement child? How do you get beyond that? It seems to me that that's your real hurdle. It is, it is my real burden. And, you know, so what I was saying under the Doe-X-Roe-Johnson, you know, from my perspective, my view is that this court already recognized that there's a known risk of sexual abuse in placements when you place a sexually reactive child with other children. And then we also believe that Hope-Taylor v. Riojas, those cases show, and they're certainly corrections cases, but what you have is the affirmative act where a state has custody and control of someone. What about if I had children that were in the school district? Right. And the foster system put a, you know, sexually dangerous, allegedly sexually dangerous child in a foster home and that meant that that child went to my children's school. Yes. Do you think that the foster agency would be responsible to the parents of the students or to the students that are in that school because they, you know, failed to notify the school officials that, you know, a sexually dangerous child was now going to be attending the school? No, I don't. Why not? Because it sort of seems like that's the same. If it's clearly established that it extends beyond those in, you know, DSS's custody, why do we draw a line at those that live in a home versus those that go to a school? I think because the victims are clearly identifiable in this matter where a school, it's much more general. But the question of whether they abused them or not, I mean, they're going to be identifiable because they were children who were abused. No. So they're identifiable. We know their names. The victims? Yeah. I mean, afterwards, but here... Yeah, but that's the question, right? Is that like, you know, you only know that they're victims once they've been abused. And so it seems like to me that your approach would suggest to us that DSS, in my example, you know, negligently, you know, placed a child in a position to go to a school and didn't notify the school or the parents at that school that they were doing so and that that would have the same sort of constitutional implications as you have here. I do... I think it's broader on who... Right, but why do you think that it should be different, right? Because obviously, if that's true, we go down a long road, right? Because we've got schools and we've got gyms and we've got, you know, music classes and, you know, we've now opened up sort of liability on constitutional grounds to a pretty broad set of folks. And so I guess I'm having a hard time seeing why these children who were not in DSS custody are different from other children who are not in DSS custody who are exposed to, you know, a foster child through the negligence alleged of DSS. I think also because in the social work problem, you know, using your rules, you know, your professional social work standards, when you're matching up a foster child with a family, you are, you know, the caseworker is required to actually look at who's in the household from every adult to every child and make sure that it's appropriate. And so we think that the constitutional rule turns on the, like, DSS rules? Like, so DSS happens to define that as the rule and that's where the constitutional line comes from? No, Your Honor. I think what I believe I've identified as, you know, the essential elements in state-created danger is that there is an affirmative act. There's a known danger and there are identifiable victims where, you know, there creates this actual responsibility, a responsibility to the people that get harmed that are known beforehand. Not, I mean, you know, they don't know who's in the school or what's in the school and they don't investigate the backgrounds of those people. The state has taken more action, more, they essentially have more responsibility to know, you know, who all is being, who could be harmed in that situation. Can I go back to Judge Keenan's question about, we've got this, the principle of state-created danger, that's fairly well established, but the Supreme Court has told us time and again that when we're dealing with qualified immunity, and in particular the clearly established prong of that qualified immunity, did we lose? I think we just lost, maybe. Are you still with us, Judge Keenan? Yes. Okay. Your screen here is something different now. The monitor in front. Can you just stop the clock for Judge Keenan? Oh, what's the, the screen on the bottom? I don't, let me go contact our team. Okay. I think he's on it. Yeah, so long as Judge Keenan can still hear and see us, then we're good. Yes. Okay, great. We can start. So anyway, back to, sorry Mr. Butcher, back to my point about qualified immunity. The Supreme Court has told us time and again that we can't define the principle at too high a level of generality, right? And so we have to, if we're going to hold people accountable under Section 1983, they've got to have fair notice that what they were doing violated clear principles so that only the most plainly incompetent public officials are on the hook for their misconduct. Okay. But you're making a pretty good argument, I suppose, that we might want to extend the clearly, the state created danger to these set of facts. But that doesn't help you with respect to the second prong of the qualified immunity analysis because it seems to me that Ms. Register would not have been on notice that she had to abide by this principle. Well, I think that there are certain, I mean, when you have clearly established, of course, that's the easiest part. Easiest for who? Well, for the plaintiff, when you have a case on all fours, you know. And, you know, the Doe case. That's, you know, something that we litigate often and, you know, so. But here, so, you know, from our perspective, the identification, let me rephrase this. So, I mean, you know, the school example, and that's what I really was thinking this morning, is that it's more than just a student body population. It is two known children who, they knew the age and their abilities. And she knowingly and intentionally placed this child, knowing that this child would sexually act out on these two children. So when that occurs, then, you know, Malley v. Briggs does say it protects all but the plainly incompetent and those who knowingly break the law. And here, she, you know, foster care, South Carolina's chronically short homes. And one of the things during that time is, you know, that she wanted to find a place for that child so she didn't have to sleep in a DSS office or at a hotel to keep the child. So from our perspective, she intentionally harmed these children by placing a snake in the crib of these children. All right, Mr. Butcher, I'm going to stop you because you're over time. You've got some time left for rebuttal. But before you sit down, I want to be sure that Judge Keenan doesn't have any additional questions for you. Thank you, Chief. No. Okay. All right, thank you very much. Thank you. Mr. Montgomery? May it please the court, it's a pleasure to be here with you. I thank you for hearing our case today. And I don't know, walking over today reminded me the first time I came to this court, which is longer ago than I want to admit. But the real question we have here today is a pretty simple one. And it's a simple question is, did the district judge correctly rule that Ms. Register is immune from suit under the doctrine of qualified immunity? And we believe the simple answer to that is an emphatic yes. While the appellate here has painted a picture with facts and allegations, and obviously we understand that we're looking at summary judgment, everything gets to be skewed as far as the court determines those facts are in the light most favorable to the non-moving party. So accepting that, we're still faced with the fact that the plaintiff in this case is unable to establish a right. A constitutional right that has been protected, that is a known right, and that is one, as we put out, that she clearly knew she was violating with her placement. And I'm going to refer to the child JF as Zoe because it's easier not to use initials. But I want to note something that I think is really critical here. Can I ask you, Mr. Montgomery? You just conceded that we have to accept the facts as alleged by the plaintiff. And when I read these set of facts, and of course they may be disputed, there may be some nuance here, but if we accept the allegations, it seems obvious to me that a social worker shouldn't place a child who might have tendencies to abuse other children in a foster home without telling the foster parents that that might be a possibility. It just seems like so obvious to me. Well, I think, obviously, the first question is, you know, these are allegations, there's no real evidence in the record. I understand that, but you just told me that the allegations are to be accepted as true. I understand that. So let's start with that premise. And why isn't that so obvious, that the social worker shouldn't do that? Well, I think the question of fact is, what did the social worker know and not know? And the allegations that have been made... Right, but you're actually not disagreeing with the Chief, right? If these facts are true, right? Yes. Then everybody would acknowledge that the DSS should not have done so. That is not the same thing as admitting that there's a federal constitutional claim.  There might be all kinds of negligence claims. There might be, indeed, criminal liability under state law. There might be a variety of different, you know, disciplinary actions that DSS could take. You're not actually arguing that if these facts are true, that DSS did a good thing here. Your argument is limited to saying it's simply not a federal constitutional issue. That is correct. Right. My argument, and I point out that the Chief Judge... Because we will acknowledge that whatever happened here should not have happened if these facts are true. I agree with you. Right. And I point out that, you know, Chief Judge Diaz had a case last year, the Gellin versus Baltimore County case, which I would suggest the facts were even more horrific than they are here. The judges, the correctional officers, listened to the inmates screaming about a young lady who was about to commit suicide. She did. There were no rounds made. And yet there was still a finding that there was, in fact, qualified immunity because there was no known right in the way that the case was pled. It was very similar here. There's no defined right that's pled or mentioned as to what constitutional right these children have. And we'd all agree that, and I would take your questions, Judge Richardson, and expand them even further. The child gets a job. One of the things that came out in the discovery here is that the foster parents were wanting Zoe to get a job. She gets a job and goes and does something. You know, I mean, at what point does that constitutional burden that the plaintiffs want to imply, it extends to the world? And I think that one of the important things in looking at the statutes that they cite, which again, I think we all agree, that no court has said that a state statute serves a basis for a federal constitutional claim in this circumstance. But the statutes that they cite show the wisdom of the General Assembly in protecting the children in the state's custody. They don't expand that and say, oh, we're protecting everyone because you opened Pandora's box. And the other thing that I want to emphasize, which I think has not been emphasized, is this is not a mandatory placement of a foster child. These parents, as the record reflects, not only have the opportunity to ask any questions they want, but this particular set of parents says, oh, in fact, DSS misrepresented other children to us. And they want to use that as a basis for imputing bad conduct to DSS. But I would suggest to the court that it also suggests that they weren't paying a real great deal of attention. And, you know, the other thing that is admitted in the facts and there's no dispute about is that these parents acknowledged that this child was not to have access to a cell phone. He was not to have access to the internet. Yet the very complaint that the plaintiff makes inures only because that occurred. And, you know, there is no allegation, there's no evidence in the record that this child, Zoe, ever touched the two children in the home. The only evidence in the record is that this child showed them pornographic video. And, in fact, the father's testimony is that the search history for the pornographic sites went all the way back to November, which was before this child was in the house January 5th. And that he exposed himself to them and there's some allegation that either he did or did not masturbate. But there's no touching. There's, you know, it's not something you want your children to see. But there's a real question of how there's harm. And I point out there's no expert report to suggest that there's any deficiency in anything, although... Is any of that... I mean, you just gave us five things that none of them seem relevant to what we have here, right? I mean, maybe that goes to a question of damages or injury, but nobody's raised that, to my knowledge, here. Maybe you have a contributory negligence claim if we lived in a world where contributory negligence was relevant to our federal claim here, but I don't think we are, and so maybe that's going to be a good argument when you end up back in state court. I guess I'm not sure why... I mean, I understand your primary argument. The last several things that you've just said where you're impugning the parents, I guess I don't understand why that's relevant to what we have to decide. And I first suggest, Court, I'm not trying to impugn the parents. I'm just trying to reflect that when we look at this, we have to look at this in totality. And where is that constitutional right? I mean, there has been no indication... There's been no case cited. The closest they cite to a case is Doe. There's no recognized authority cited. They go into a danger kind of issue, but one of the points I was trying to make to the Court there is that there is no direct affirmative act by the state to create a danger. The danger was created by a number of events, a sequence of events, if you will. And the so-called comparative or contributory negligence is simply an indication that if you're looking at a state-created danger, the proximate causation of that state-created danger was not the action of the state. The state didn't take an action as it related to the two children who were plaintiffs here. The state entered into a contract with their parents where their parents agreed to serve as a foster child... a foster parent for this child. And so we're not talking about a situation, and I know we often deal with qualified immunity in a corrections sense, but we're not talking about a situation where the state had custody, the state had control, the state had action. The state, if you look at the facts as they're presented, makes a phone call. Someone says yes. That someone says, well, what information do we need to know or something to that effect? And the state says, this child does not have Internet access, this child is not to have access to a phone, this child has been sex-trafficked. Those are undisputed facts in the record. And they want to suggest that, oh, we had notice of other things and they should have told us. But I'd suggest that when you're talking about, from a constitutional standpoint, what's been provided certainly puts them on notice that there's an issue with this child and that it's sexual in nature. Would the result be any different if the children who were allegedly abused were also foster children who were under the custody of the state? Your Honor, I think that's clear. I think that's the Doe case, Doe v. South Carolina DSS, per se. That would be different. And that's where we get into that whole expansion circumstance. If we start expanding the universe of constitutional protection beyond the people that are in the care, custody, and control of the state, then that opens the door to everyone. The child goes out and, again, school, work, music lessons, all the things that Judge Richardson cited, where do you draw the line? And Mr. Butcher says, well, you know, they know about these people. Well, I would suggest that the real problem would be the people they don't know about. The parents whose children are in that school that don't know anything about this child. Don't know they're a foster child. You know, they could invite them into their home. I mean, they're all kind of permutations, which is why the law is so clear that you have to have a clear and absolute kind of finding. And it doesn't have to be on all fours, clearly, but there has to be a reasonable way that Cary Register, as a defendant here, would have noticed that, oh, if I do this and place this child, I'm violating these other children's constitutional rights. And the plaintiff appellant has not presented any evidence to the record that reaches that threshold. And I think sometimes you can look at, if you will, the idea of the cases that we deal with that are where constitutional qualified immunity is denied as much as the ones where it is adopted. And, you know, I note that in this case, the other thing is that this child was in their home for about six weeks. I beg the Court's indulgence just a moment. Just when we look at the record in this case, as far as what is unnecessary and what is harm, I look at some of the Court's recent decisions that I point out. This month, in the case of Bolick v. Anderson, which you just released the 13th, last week, you found qualified immunity in a certain, you denied qualified immunity, but you denoted in that case that a prisoner had been kept without access to exercise for 324 days, and that there were clear case law that showed that that was a requirement. In Barkles v. Wright, which was decided 3-3 of 2026, the Court said that there were five specific cases on point that found that constitutional right. And in Cox v. Quinn, there was an exacerbation case, and there was a case, it was clearly established when the right was. And so, I think the big issue that we're looking at here is what can the Court show this Court that clearly establishes a right? They want you to extend a right, but I would suggest to you that extending that right today does not put Kerry Register on notice of that right January 5th of 2022. And so that's the environment that we have to look at. What did she know or could she know on January 5th 2022 that would have let her know that if I do what they say she did, that I have violated these children's constitutional rights under the 8th, the 14th, whatever amendment you want to look at. They say the 14th, but they've really never indicated exactly what right they were violated of and to be safe, which is what they say in both their brief and their pleadings. So, what did she know that day? Yes, you're right. Maybe there's a negligence case here, maybe there are lots of other questions here. And, of course, the district court took those state law claims and said, I'm not accepting jurisdiction on those. They go back to the state court. So, denial of this does not deny the plaintiff her day in court. It just puts it in a different place and under a different cause of action with different standards and rules.  I can only say that we all see cases that have horrible facts and horrible situations. And the old adage that bad facts make bad law is certainly true. And I would certainly encourage the court to look beyond the claims and the facts and, again, recognizing that what's recognized as fact in this case may or may not be the real facts in this case. And look at it from a standpoint of was that clear right there? Was that clear right available? And on January 5th, 2022, is it reasonable and is it proper and is it appropriate to say, there is a clear right here, Ms. Register. You should know about it and you know that if you do this and what did you do allegedly, you didn't tell them all of the history of this child because you told them some. You told them enough to prevent what happened had they followed your recommendation, but they didn't. And that's the parents, not the children. And so we would suggest, and I'm not going to take time talking because I know you all don't want to hear me talk if you don't have any questions. So I'm going to thank the court and ask you to please affirm the lower court. All right. Thank you very much, Mr. Montgomery. Mr. Butcher. Yes, Your Honor. So I think what, going back to Judge Richardson's questions, I think what does distinguish it from placement in a school is the intimate knowledge that the agency has and is supposed to have of the contents of the family. The other thing is... I mean, I don't want to belabor this, but... Yes, sir. I'm quite confident the evidence would show that DSS is aware that the third grade has students in it. Right? Yes. I mean, so, like the fact that they knew there were children here, they surely know that the third grade has children in it. Yes, Your Honor. They may not know their names, but the names don't matter, right? Doesn't matter whether they knew the names of these. They know that the third grade has children in it. And so if this Zoe is sent to the third grade, there's no doubt that there are children where Zoe is going to be. Well, Zoe wouldn't be unless it's a SKESA school. I mean, because Zoe was 16. I'm picking a date. Fair. Alright. Tenth grade. They are also aware that the tenth grade has children in it. Yes, Your Honor. Yes. I do understand that. I just believe that the agency has more of a special relationship with that family. And when they know the actual contents of the family that the child spends the majority of their time in that home asleep or where they're supposed to sleep, those I think those create more of a responsibility by the state not to place a danger in that home. You know, and so, I mean, I think we meet the elements that when something is so obvious that you don't, you know, I think everybody knows you shouldn't place a sexually aggressive child with younger or more vulnerable children. I mean, that's you know, who do you have to tell other than people we send to prison? Right? But here, you know, that's exactly what they did. They ignored all their knowledge of this child's background. You know, DSS had provided post-adoption services. You know, and so they knew this child. Just one question to make sure I understand. So is your argument that even with full disclosure of all facts that DSS would have violated the children's constitutional rights by placing this child in the home? Because it's a sexually aggressive child, and so placing in some places you say this is effectively a failure to disclose case. If they had told the parents and the parents had knowingly adopted or let that child in the house, that that wouldn't violate their constitutional rights. But just now you seem to be saying you just can't do it at all. Even with full disclosure it would violate the constitutional rights. Which is the argument that you've presented here? I understood it to be an informational issue, but the argument you're saying is that like you cannot place a child like this in a foster home, period. With children. Younger and more vulnerable children. Yes, Your Honor. Even if a parent said that, I mean, that would be you know, that, oh, you're welcome to have Johnny, you know, even though I have a 5 and a 7 year old. I mean, yeah, that would be yeah, that would be That would violate the constitutional rights of the 7 and 9 year old. Yes, sir. Yes, sir. I believe so. I mean, they're not a party to any contract with DSS. And DSS has to make that assessment on safety. You know, just like Rather than the parents, right? So the parent's responsibility to their own children doesn't matter because DSS has a responsibility to children that are not in their care and custody who happen to interact with children that they place. Yes, Your Honor. I believe they have special knowledge and understanding. I mean, there are a lot of people that don't understand that, you know, when children have sex with other children, it kind of like spreads like a virus through a household or through a group of them because the children get so warped that they don't understand, that they seek the sexual feelings but, you know, they don't understand what they're doing. It really warps their understanding of love, intimacy because they're not ready for it. But I mean, that's more Can I take you back to the, just so I understand the right at issue here. In your brief, you first began with a claim that the right at issue was that the genesis of that right was state statutes. A state statute that purported to protect foster children in the custody of the state. Are you walking that back? You're no longer relying on that? I think that more points towards the obviousness that what they were doing was wrong and you know But do you agree that the genesis of a federal constitutional right can't be a state statute? Right. I do understand that. I do think though that when we're looking for what is obviously you know something things that put people on notice of what is so obvious you know, I don't think you have to read case law to determine, to figure out that you shouldn't place children with, sexually aggressive children with other children. Even in a foster home and you know the foster home, the foster the children of the foster parents are the least able to protect themselves in this whole situation if no one is looking out and doing the actual social work problem of determining the safety of the placement and they used to call it matching but you know bottom line, when they do look at a home from a matching perspective they need to make sure that there is no one that can harm them or harm themselves or that they can harm so you know same with violent children, you don't put them with someone who can't defend themselves. My time is running out. Is there anything else? Judge Keenan? No, thank you. I appreciate it. Thank you. I want to thank both counsel for their arguments this morning. We'll come down and greet you and then move on to our second case.
judges: Albert Diaz, Julius N. Richardson, Barbara Milano Keenan